*KOG 6.6.23*



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

| | | | |
|---|---|---|---|
| *Jeffrey Izant*<br>*Assistant United States Attorney*<br>*Jeffrey.Izant@usdoj.gov* | *Mailing Address:*<br>*6500 Cherrywood Lane, Suite 200*<br>*Greenbelt, MD 20770-1249* | *Office Location:*<br>*6406 Ivy Lane, 8th Floor*<br>*Greenbelt, MD 20770-1249* | *DIRECT: 301-344-0229*<br>*MAIN: 301-344-4433*<br>*FAX: 301-344-4516* |

June 6, 2023

Michael Tomko, Esq.
Rosenberg & Tomko, P.A.
201 N. Charles Street – Suite 2304
Baltimore, Maryland 21201

'23 JUN 8 PM4:13
USDC - BALTIMORE

Re:   United States v. Elias Nick Costianes,
      Criminal No. JKB-21-458

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (the "Agreement") that has been offered to your client, Elias Nick Costianes (hereinafter the "Defendant"), by the United States Attorney's Office for the District of Maryland (the "Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **5:00 p.m. on Tuesday, June 6, 2023**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offense of Conviction

1.      The Defendant agrees to plead guilty to Count Nine of the Superseding Indictment charging the Defendant with possession of a firearm or ammunition by an unlawful user of or addict to any controlled substance, in violation of 18 U.S.C. § 922(g)(3). The Defendant admits that the Defendant is, in fact, guilty of the offense, and will so advise the Court.

### Elements of the Offense

2.      The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: that, on or about the date alleged in the Superseding Indictment, in the District of Maryland, (1) the Defendant possessed a firearm or ammunition; (2) the Defendant's possession of the firearm or ammunition was knowing; (3) the Defendant was an unlawful user of or addict to any controlled substance; and (4) the Defendant's possession of the firearm or ammunition was in or affecting interstate commerce.

### Penalties

3.      The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|-------|---------|----------------|----------------|--------------------|--------------|--------------------|
| 1 | 18 U.S.C. §§ 922(g)(3), 924(a)(2) (2021) | N/A | 10 years | No more than 3 years | $250,000 | $100 |

   a. Prison:  If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

   b. Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

   c. Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

   d. Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

   e. Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

   f. Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (i) the full amount of the fine or restitution is nonetheless due and owing immediately; (ii) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (iii) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

   4. The Defendant understands that, by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

   a. If the Defendant had pleaded not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent

counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.     If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d.     The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e.     If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed that would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" provisions below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced case, and the Court will find the Defendant guilty.

h.     By pleading guilty, the Defendant also will be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that, if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can

3

lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551–3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991–98. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein.

*Count Nine:  Possession of a Firearm or Ammunition*
*by an Unlawful User of or Addict to Any Controlled Substance*

a.      This Office and the Defendant further agree that the applicable base offense level for Count Nine is **20**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") §2K2.1(a)(4)(B), because the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine and the Defendant was a prohibited person at the time the Defendant committed the instant offense.

b.      A **2**-level increase applies, pursuant to U.S.S.G. §2K2.1(b)(1)(A), because the offense involved between three and seven firearms.

*Relevant Conduct:  Conspiracy to Distribute and to*
*Possess with Intent to Distribute a Controlled Substance*

c.      The Statement of Facts set forth in Attachment A to this Agreement specifically establishes the commission of additional offenses other than the offense to which the Defendant has agreed to plead guilty. This Office and the Defendant stipulate and agree that, pursuant to U.S.S.G. §1B1.2(c), the additional offenses are treated as if the Defendant had been convicted of additional counts charging those offenses.

d.      This Office and the Defendant stipulate and agree that, pursuant to U.S.S.G. §2D1.1(c)(12), the applicable base offense level for conspiracy to distribute and to possess with intent to distribute a controlled substance is **14**, based on the quantities of cocaine and testosterone involved in the offenses.

4

e.      A **2**-level increase applies, pursuant to U.S.S.G. §2D1.1(b)(1), because a dangerous weapon (including a firearm) was possessed.

*Grouping*

f.      This Office and the Defendant further stipulate and agree that, pursuant to U.S.S.G. §3D1.2(d), Count Nine and the Relevant Conduct are combined into a single group.

g.      Pursuant to U.S.S.G. §3D1.3(b), the offense level applicable to the group is the highest offense level of the offenses in the group.

h.      Accordingly, the Defendant's adjusted offense level is **22**.

i.      This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. §3E1.1(a), based upon the Defendant's apparent recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office **does not agree** to make a motion pursuant to U.S.S.G. §3E1.1(b) for an additional **1**-level decrease. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. §3E1.1(a) if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offenses; (iii) gives conflicting statements about the Defendant's involvement in the offenses; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.      There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

8.      Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

Obligations of the Parties

9.      At the time of sentencing, this Office will **recommend** that the Court sentence the Defendant to **not more than 37 months' imprisonment**.

10.     The Defendant reserves the right to advocate for a reasonable sentence, and this Office and the Defendant reserve the right to advocate for a reasonable period of supervised release, and/or a reasonable fine, considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any count of

the Superseding Indictment. At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Forfeiture

11.     The Defendant understands and agrees that, as a result of the Defendant's guilty plea, the Defendant will not be permitted to own, possess, or use a firearm or ammunition.

12.     The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

13.     Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in any money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities, including:

      a.      one Glock 17 9mm pistol, bearing serial number SGS663;

      b.      one Smith & Wesson M&P 15 .556 caliber semi-automatic rifle, bearing serial number SN90598;

      c.      one Ruger Mini 14 Ranch Rifle .223 caliber semi-automatic rifle, bearing serial number 580-94983;

      d.      one Remington Model 870 12-gauge shotgun, bearing serial number RS96725E;

      e.      approximately one box of Federal .556 caliber ammunition;

      f.      approximately four boxes of Remington .22 caliber long rifle ammunition;

      g.      approximately ten boxes of Remington 12-gauge ammunition;

      h.      approximately three boxes of Winchester 9mm ammunition;

      i.      approximately three boxes of Federal 9mm ammunition;

      j.      approximately six boxes of Remington 12-gauge buckshot;

      k.      approximately one box of Winchester .556 caliber ammunition;

      l.      approximately three boxes of Winchester .223 caliber ammunition;

      m.      approximately two rounds of Remington 12-gauge ammunition;

      n.      approximately 29 rounds of Winchester .223 caliber ammunition;

o.      approximately 14 rounds of Winchester 9mm Luger ammunition;

p.      approximately 47 rounds of Aguila .22 caliber long rifle ammunition;

q.      approximately 14 rounds of Remington 12-gauge shotgun shells;

r.      approximately 5 rounds of Winchester 12-gauge shotgun shells; and

s.      approximately 100 rounds of Federal 9mm Luger ammunition;

all seized during execution of search warrants for the Defendant's residence and vehicle in Nottingham, Maryland, on February 12, 2021.

14.     The Defendant agrees to consent to the entry of such an Order of Forfeiture and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2, and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding forfeiture during the plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

15.     The Defendant agrees to assist fully in the forfeiture of any such property. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

16.     The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Waiver of Appeal

17.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all rights, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute, to the extent such challenges legally can be waived.

b.      The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of

imprisonment, fine, term or condition of supervised release, or order of forfeiture) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, the decision whether to run the sentence concurrent with or consecutive to any other sentence, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, or term or condition of supervised release) except as follows:

        i.      The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds 37 months; and

        ii.     This Office reserves the right to appeal any term of imprisonment to the extent that it is below 30 months.

        c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned case and agrees not to file any request for documents from this Office or any investigating agency.

## Defendant's Conduct Prior to Sentencing and Breach

18.     Between now and the date of sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. §3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

19.     If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (a) this Office will be free from its obligations under this Agreement; (b) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C); and (c) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

## Consequences of Vacatur, Reversal, or Set-Aside

20.     If a conviction entered pursuant to this Agreement is vacated, reversed, or set aside for any reason, then this Office will be released from its obligations under this Agreement, and any prosecution that is not time-barred as of the date of the signing of this Agreement (including any counts this Office has agreed to dismiss) may be commenced or reinstated against the

Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. The Defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date this Agreement is signed, and any applicable statute of limitations is tolled from the date of this Agreement until 120 days after the vacatur, reversal, or set aside becomes final. The Defendant waives any defenses based on double jeopardy, pre-indictment delay, or the Speedy Trial Act.

## Court Not a Party

21.     The Defendant expressly understands that the Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties, including any recommendation regarding the length of the Defendant's sentence or whether the sentence imposed should run concurrent with or consecutive to any other sentence. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

22.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties, and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Sincerely,

Erek L. Barron
United States Attorney

Digitally signed by JEFFREY
IZANT
Date: 2023.06.06 15:34:39
-04'00'

By:     Jeffrey J. Izant
P. Michael Cunningham
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

_____
Date

_____
Elias Nick Costianes

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement, with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

_____
Date

_____
Michael Tomko, Esq.

**ATTACHMENT A**
**STATEMENT OF FACTS**

*The undersigned parties stipulate and agree that, if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

The Defendant, **ELIAS NICK COSTIANES** ("**COSTIANES**"), 44, is a former resident of Nottingham, Maryland. At all relevant times, **COSTIANES** was an unlawful user of numerous controlled substances and illegally possessed four firearms and thousands of rounds of ammunition. **COSTIANES** also conspired to distribute, and to possess with intent to distribute, cocaine and testosterone.

<u>**COSTIANES**'s Drug Use and Unlawful Possession of Firearms and Ammunition</u>

On February 12, 2021, at approximately 6:02 a.m., agents with the Federal Bureau of Investigation ("FBI") executed a search warrant at the Defendant's residence in Nottingham, Maryland. **COSTIANES** was present and taken into custody pursuant to an arrest warrant that had been issued by the U.S. District Court for the District of Columbia. Agents also seized an iPhone in connection with **COSTIANES**'s arrest. **COSTIANES** was advised of his *Miranda* rights, knowingly waived them, and voluntarily agreed to be interviewed. Among other things, **COSTIANES** told agents that he had been sleeping on the couch and that he kept four firearms in cases in the basement of the residence. **COSTIANES** identified the firearms as a Glock 17, a Smith & Wesson assault rifle, a Remington shotgun (which **COSTIANES** said was a present from his "ex"), and a hunting rifle. **COSTIANES** stated that the hunting rifle "fired .223 [caliber]," but indicated that none of the firearms were loaded.

Agents searched the basement and—consistent with **COSTIANES**'s statements—located the following four firearms: (1) a Glock 17 9mm pistol, bearing serial number SGS663; (2) a Smith & Wesson M&P 15 .556 caliber semi-automatic rifle, bearing serial number SN90598; (3) a Ruger Mini 14 Ranch Rifle .223 caliber semi-automatic rifle, bearing serial number 580-94983; and (4) a Remington Model 870 12-gauge shotgun, bearing serial number RS96725E. **COSTIANES** was the registered owner of each of the firearms except the Ranch Rifle. Two of the firearms—the M&P 15 and the Ranch Rifle—were semiautomatic firearms that were capable of accepting a large capacity magazine. Each of the firearms was seized, examined, and found to meet the definition set forth in 18 U.S.C. § 921(a)(3)(A). Because none of the firearms were manufactured in Maryland, they necessarily traveled in and affected interstate commerce prior to their recovery from **COSTIANES**'s residence on February 12, 2021.

In the same corner of **COSTIANES**'s basement, agents found thousands of rounds of ammunition, including ammunition that matched the caliber of each of the four firearms that belonged to **COSTIANES**. Additionally, agents searched **COSTIANES**'s vehicle, which was parked outside the residence, and located a box containing 100 rounds of 9mm ammunition in the trunk. All of the ammunition, which is identified in subparagraphs 13(e) through 13(s) of the Plea Agreement attached hereto, was seized, examined, and found to meet the definition set forth in 18

U.S.C. § 921(a)(17)(A).  Because none of the ammunition was manufactured in Maryland, the ammunition necessarily traveled in and affected interstate commerce prior to its recovery on February 12, 2021.

Accordingly, **COSTIANES** stipulates and agrees that he knowingly possessed all of the firearms and ammunition described above.  Moreover, when **COSTIANES** possessed the firearms and ammunition on February 12, 2021, **COSTIANES** knew that he was an unlawful user of cocaine, testosterone, and marijuana because **COSTIANES**'s use of each substance was consistent, prolonged, and recent.

- Cocaine, a Schedule II controlled substance:

    o *Consistent*: A search of the iCloud account associated with **COSTIANES**'s iPhone revealed more than 450 messages with contacts involved in **COSTIANES**'s purchase or use of cocaine.  **COSTIANES** exchanged these messages during nearly every month from March 2020 onward, including April, May, August, October, November, and December 2020.  In addition to the volume and frequency of these communications, the content of some messages further established that **COSTIANES** used cocaine regularly.  For example, on October 8, 2020, **COSTIANES** messaged T.S., his primary cocaine supplier, "I have to quit I have a problem Nose hurts and bleeding all day."

    o *Prolonged*: A forensic extraction of data from **COSTIANES**'s iPhone revealed that, as far back as June 23, 2018, **COSTIANES** was sending messages describing his purchase of cocaine.

    o *Close in time*: According to financial records, between August 2020 and January 2021, **COSTIANES** paid T.S., his primary cocaine supplier, a total of nearly $6,000, which is consistent with the purchase of more than 60 grams of cocaine during this five-month period.  Between December 2020 and January 2021 alone, **COSTIANES** paid T.S. approximately $2,500, which is consistent with the purchase of approximately 28 grams— or an entire ounce—of cocaine during just this two-month period.  Consistent with these financial records, on December 11, 2020, **COSTIANES** sent a message to contact "Andrew" stating, "I've been blowing rails LOL."  Finally, call detail records revealed that **COSTIANES** and T.S. remained in close communication in the weeks leading up to **COSTIANES**'s arrest, exchanging more than 22 calls in December 2020; more than 37 calls and messages in January 2021; and at least 6 calls between February 1 and February 8, 2021.

- Testosterone, a Schedule III controlled substance:

    o *Consistent*: **COSTIANES**'s iCloud account contained more than 350 messages with contacts involved in **COSTIANES**'s purchase or use of

testosterone. **COSTIANES** exchanged these messages during nearly every month from February 2020 onward, including in March, April, May, July, August, September, October, and November 2020, and in February 2021. In addition to the volume and frequency of these communications, the content of some messages further established that **COSTIANES** used testosterone regularly. For example, on November 21, 2020, **COSTIANES** wrote to his primary testosterone supplier, J.R., "I'm doing 1cc of test a week think I should step it up??"

o *Prolonged*: **COSTIANES**'s iCloud account contained text messages indicating that **COSTIANES** had been taking testosterone since at least July 8, 2019.

o *Close in time*:

- On February 10, 2021, two days before the search of **COSTIANES**'s residence, **COSTIANES** messaged contact D.M.—who also purchased testosterone from **COSTIANES**—and wrote that he (**COSTIANES**) was still taking testosterone "once a week."

- During the search of **COSTIANES**'s residence on February 12, 2021, FBI agents recovered four glass vials that each contained a clear liquid substance and were labeled "Testosterone". One vial was found in a bathroom alongside male toiletries, two vials were found on the kitchen counter, and the fourth vial was located next to the couch where **COSTIANES** had been sleeping. Laboratory analysis confirmed that the vials contained, respectively, 9.6 grams, 7.5 grams, 4.2 grams, and 0.8 grams of either testosterone enanthate or testosterone cypionate.

- Agents also found a hypodermic needle next to the couch where **COSTIANES** had been sleeping. From a swab of the cap attached to the needle, the FBI obtained a quantity of male DNA. The DNA was analyzed by the FBI's DNA Casework Unit, which determined that the DNA originated from two individuals and that the combination of DNA was 12,000 times more likely if **COSTIANES** contributed his DNA, providing "strong support" for including **COSTIANES** as a contributor.

- On February 17, 2021, agents executed a warrant authorizing the FBI to obtain a sample of **COSTIANES**'s blood. On that day, agents met **COSTIANES** at a medical center and advised **COSTIANES** not to discuss his criminal case. **COSTIANES** nonetheless volunteered that he had "low T." And when a nurse

3

asked **COSTIANES** where he was filling his prescriptions, **COSTIANES** responded, "Oh, I don't believe in those."

- Marijuana, a Schedule I controlled substance:

  o *Consistent*: **COSTIANES**'s iCloud account contained approximately 270 messages with contacts involved in **COSTIANES**'s purchase or use of marijuana. **COSTIANES** exchanged these messages in January, February, July, August, October, November, and December 2019; and January, February, March, April, May, June, July, September, October, and November 2020; and January and February 2021. In addition to the volume and frequency of these communications, the content of some messages further established that **COSTIANES** used marijuana consistently. For example, on October 1, 2020, **COSTIANES** messaged contact M.A., "I mean I don't remember the last time I didn't bro I smoke weed every[d]ay lmao."

  o *Prolonged*: **COSTIANES**'s iCloud account contained text messages indicating that **COSTIANES** began illegally using marijuana as far back as January 2019.

  o *Close in time*: The forensic extraction from **COSTIANES**'s iPhone revealed that, on February 11, 2021, **COSTIANES** and his primary marijuana supplier, D.H., exchanged 3 phone calls and 18 text messages in which **COSTIANES** and D.H. made plans to meet at a location they had previously used to conduct marijuana transactions. On February 12, 2021, FBI agents seized a digital scale and a mason jar containing approximately 28 grams of marijuana from the front console of **COSTIANES**'s vehicle. And the FBI's Chemistry Unit detected marijuana's primary psychoactive chemical in the sample of **COSTIANES**'s blood that was collected on February 17, 2021.

**COSTIANES**'s Distribution of and Possession with Intent to Distribute Cocaine and Testosterone

Furthermore, the search of **COSTIANES**'s iCloud account revealed that, not only did **COSTIANES** purchase cocaine and testosterone for his own personal use, but that **COSTIANES** also conspired to distribute—and did, in fact, distribute—cocaine and testosterone to others.

For example, text messages revealed that **COSTIANES** purchased or attempted to purchase cocaine for contact "MC." On May 1, 2020, **COSTIANES**—at MC's request—asked "Greg," one of **COSTIANES**'s cocaine suppliers, what Greg would charge **COSTIANES** for another ounce of "snow."

Between October 30 and November 1, 2020, **COSTIANES** successfully distributed 4 half-gram bags of cocaine to buyer S.C. for $200. **COSTIANES** told S.C. that he had been buying from his supplier for the past 6 months and that "it's very good shit he doesn't mess with it."

4

On November 1, 2020, S.C. asked **COSTIANES** if he could supply another "ball"—*i.e.*, an "eight-ball," or an eighth ounce (3.5 grams) of cocaine—for $350. **COSTIANES** agreed but wrote that he would sell it to S.C. later, writing, "I'm at work right now." On November 5, 2020, S.C. followed-up with **COSTIANES** to confirm the transaction. Two days later, on November 7, 2020, **COSTIANES** informed S.C. that his supplier was out of cocaine "balls" and could only supply 2.5-gram bags for $300 each, which **COSTIANES** thought was too expensive. In the ensuing conversation between **COSTIANES** and S.C., which occurred while **COSTIANES** was working at his employer's office in Gambrills, Maryland, **COSTIANES** offered to get S.C. more cocaine when **COSTIANES**'s supplier obtained an additional supply.

| To | From | Time (PT) | Message |
|---|---|---|---|
| **COSTIANES** | S.C. | 14:30:18 | He will only give me 2.5 g for 300 |
| **COSTIANES** | S.C. | 14:30:26 | I told him no thank you it's too much |
| **COSTIANES** | S.C. | 14:30:45 | He said he is paying 2200 an oz almost 100 a g his cost |
| **COSTIANES** | S.C. | 14:30:56 | So I said don't worry about it |
| S.C. | **COSTIANES** | 14:31:17 | I'll take it if that's all there is |
| S.C. | **COSTIANES** | 14:31:40 | But also whatever |
| **COSTIANES** | S.C. | 14:35:31 | Yeah I mean I told him cancel |
| **COSTIANES** | S.C. | 14:35:35 | It's up to you dude |
| **COSTIANES** | S.C. | 14:35:47 | It's quality shit he doesn't touch it |
| **COSTIANES** | S.C. | 14:36:02 | He used to pay 1100 a oz and I could get balls for 200-250 |
| **COSTIANES** | S.C. | 14:36:09 | But that was pre-COVID |
| S.C. | **COSTIANES** | 14:36:37 | I'm fine with it if you're up for meeting me |
| **COSTIANES** | S.C. | 14:36:59 | Let me call him... I'm still at work for the next 20 |
| **COSTIANES** | S.C. | 14:38:20 | I didn't realize it was .3 I thought it was .4-.5 each small bag... I did some last night but think prices are too much and would like to just quit |
| **COSTIANES** | S.C. | 14:39:47 | I just talked to him... he said he sold it already since I talked to him lol |
| **COSTIANES** | S.C. | 14:40:05 | The dude legit has a bunch of customers and he says everyone is hitting hit up cause Biden won |
| **COSTIANES** | S.C. | 14:40:12 | He is going to get more just let me know bro |

On December 27, 2020, **COSTIANES** told contact "Jay" that his supplier, T.S., was going to sell **COSTIANES** 6 grams of cocaine—3 grams for **COSTIANES** and 3 grams for Jay.

Accordingly, **COSTIANES** stipulates and agrees that his agreement to distribute and possess with intent to distribute cocaine between March and December 2020 involved a reasonably foreseeable quantity of more than three ounces, or 85 grams.

**COSTIANES**'s iCloud account also contained messages reflecting his participation in a conspiracy to distribute, and to possess with intent to distribute, testosterone. On or about February 15, 2020, **COSTIANES** told J.R. that **COSTIANES** and his "friend" were looking for a new source of testosterone supply. J.R. told **COSTIANES** that he would identify a domestic supplier because it would take "less time and less chance customs gets it plus less money." By May 2020, J.R. had identified a source of testosterone supply; J.R. also agreed to supply **COSTIANES** at locations in either Columbia or Silver Spring, Maryland. Between May 10 and May 15, 2020, J.R. supplied three 10-mL bottles of testosterone that **COSTIANES** sold to D.M. for $210. D.M. transferred the $210 to **COSTIANES** using a mobile payment application. **COSTIANES** agreed to facilitate another testosterone transaction involving J.R. and D.M. in September 2020. Between September 15 and September 17, 2020, **COSTIANES** purchased six 10-mL bottles from J.R for $240 and agreed to sell three of the bottles to D.M. Finally, on February 10, 2021, D.M. told **COSTIANES** that he was ready to buy more testosterone and **COSTIANES** agreed to contact J.R. When **COSTIANES** was arrested two days later, he was in possession of four 10-mL vials of testosterone—of which two appeared to be partially used and two appeared to be mostly full.

SO STIPULATED:

Digitally signed by JEFFREY
IZANT
Date: 2023.06.06 15:35:17
-04'00'

Jeffrey J. Izant
P. Michael Cunningham
Assistant United States Attorneys

5/6/23

Elias Nick Costianes
Defendant

Michael Tomko, Esq.
Counsel for Defendant