IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | |
| | * | CRIMINAL NO. JKB-21-458 |
| ELIAS NICK COSTIANES, | * | |
| | * | |
| Defendant. | * | |
| ******* | | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America respectfully submits this memorandum in aid of sentencing in the above-captioned case, which is scheduled for September 25, 2023, at 10:00 a.m. On June 8, 2023, the Defendant, Elias Nick Costianes, pled guilty to Count Nine of the Superseding Indictment, which charged the Defendant with possession of firearms or ammunition by an unlawful user of or addict to any controlled substance, in violation of 18 U.S.C. § 922(g)(3). For the reasons set forth below, the government requests that the Court sentence the Defendant to 33 months' imprisonment and 2 years of supervised release.

### I.  Background

The Defendant's conviction under § 922(g)(3) carries a maximum prison term of 10 years, *see* 18 U.S.C. § 924(a)(2) (2021), and a maximum supervised-release term of 3 years, *see id.* §§ 3583(b)(2), 3559(a)(3). In pleading guilty, which he did just two business days before trial was scheduled to commence, the Defendant entered into a plea agreement containing a detailed Statement of Facts. *See* ECF 83. In sum, the stipulated facts established that the Defendant was unlawfully using or addicted to cocaine, testosterone, and marijuana at a time when he possessed thousands of rounds of ammunition and four firearms, including a handgun, two semi-automatic rifles, and a shotgun. *See id.* The stipulated facts also established that, in addition to using controlled substances, the Defendant sold cocaine and testosterone to other drug users. *Id.*

1

Under the terms of the Defendant's plea agreement, the government and the Defendant agreed that, pursuant to U.S.S.G. §2K2.1(a)(4)(B), the applicable base offense level for Count Nine is **20**, because the offense involved semiautomatic firearms that are capable of accepting large capacity magazines and the Defendant was a prohibited person at the time he committed the offense. *See* ECF 83 ¶ 6.a. The parties also agreed that, pursuant to U.S.S.G. §2K2.1(b)(1)(A), a **2**-level enhancement applies because the offense involved between three and seven firearms. *See id.* ¶ 6.b. Furthermore, the parties agreed that, pursuant to U.S.S.G. §3D1.2(d), the relevant conduct described in the Statement of Facts groups with Count Nine, *see id.* ¶ 6.f, and that the Defendant's adjusted-offense-level calculation is governed by Count Nine, which has the highest offense level of the offenses in the group, *see id.* ¶ 6.g. Accordingly, the parties agreed that the Defendant's adjusted offense level would be **22**. *See id.* ¶ 6.h. Following a **2**-level reduction pursuant to U.S.S.G. §3E1.1(a), based on the Defendant's acceptance of responsibility, the parties agreed that the Defendant's final offense level would be **20**.

The Presentence Investigation Report ("PSR") prepared by the U.S. Probation Office ("Probation") reaches a different conclusion. *See* PSR ¶¶ 27–46, ECF 86. Because the government reported that there was no evidence that the Defendant possessed the firearms *in connection with* any other felony offense, Probation concluded that Count Nine and the Defendant's relevant conduct did *not* group. *See id.* ¶ 27. Accordingly, Probation determined that Count Nine and the relevant conduct constituted two separate groups comprising 1.5 units under U.S.S.G. §3D1.4, *see id.* ¶ 40, which required the application of a 1-level increase to the base offense level for Count Nine, *see id.* ¶ 42. Following a 2-level decrease for acceptance of responsibility, Probation found that the Defendant's final offense level was 21. *See id.* ¶ 46.

Probation's calculation does not appear to be correct. The PSR did not identify which provision of U.S.S.G. §3D1.2 was relied upon to conclude that Count Nine did not group with the relevant conduct. So it is unclear whether Probation considered the application of U.S.S.G. §3D1.2(d), which provides that multiple counts are to be grouped "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm." The Guidelines Manual also specifically identifies §2D1.1 and §2K2.1 as provisions that are subject to grouping under §3D1.2(d). To the extent that other subsections of §3D1.2 would *not* result in grouping Count Nine and the relevant conduct, the Guidelines Commentary provides that counts "are to be grouped together into a single Group if *any* one or more of the subsections provide for such grouping." U.S.S.G. §3D1.2 cmt. app. n.1 (emphasis added). That is the case here.

Because Count Nine and the relevant conduct should, therefore, be grouped under §3D1.2(d), the Defendant's final offense level should be **20**, not 21.[1] The Defendant also has no criminal history, which places him in criminal history category I. *See* PSR ¶ 49. Accordingly, the Defendant's guidelines range of imprisonment is 33 to 41 months. *See* U.S.S.G. Ch. 5 Pt. A, Table. The guidelines range of supervised release is still one to three years. *See* U.S.S.G §5D1.2(a)(2).

**II.     Section 3553(a) Analysis**

A 33-month sentence of imprisonment—which represents the bottom of the guidelines range—is sufficient but not greater than necessary to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)(2), considering the nature and circumstances of the offense and the Defendant's history and characteristics, *see id.* § 3553(a)(1), as well as the other relevant factors in § 3553(a).

---

[1] Insofar as firearms are more dangerous when they are possessed in connection with other felonies, it is also counterintuitive that, under Probation's calculation, the Defendant's final offense level is *higher* because the Defendant did *not* possess deadly weapons in connection with another felony.

### A.    The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

For a Defendant without any criminal history, a 33-month prison term is significant. But it is an appropriate sentence in light of the nature and circumstances of the offense and the Defendant's history and characteristics. *See* 18 U.S.C. § 3553(a)(1). While the Defendant stands convicted of possessing firearms and ammunition on a single date in February 2021, the scope of the Defendant's criminal (and other wrongful) conduct was far broader than that.

First, the Defendant was a drug dealer—notwithstanding his legitimate employment. The Defendant trafficked several types of controlled substances. He distributed cocaine, testosterone, and—as the trial evidence would have established—marijuana, too. The Defendant had multiple drug suppliers and drug customers. His trafficking activities spanned several states, including Pennsylvania, Maryland, the District of Columbia, and Virginia. The Defendant even distributed drugs using the U.S. Mail. And the Defendant distributed drugs repeatedly over a period of time that spanned at least one year.

Second, the Defendant was more than just a drug dealer. He was also armed. Even though there was no evidence that the Defendant ever used, carried, or possessed firearms or ammunition in connection with his drug trafficking activities, the Defendant was, nonetheless, a drug dealer who had ready access to a handgun, a shotgun, two semi-automatic rifles, and thousands of rounds of ammunition. It requires no stretch of the imagination to contemplate the obvious harm that could have resulted from the Defendant's simultaneous drug dealing and possession of deadly weapons. After all, firearms and ammunition are known tools-of-the-trade for drug trafficking. *See, e.g.*, *United States v. Mabry*, 576 F. App'x 155 (4th Cir. 2014). Even when they are possessed "only" in a defensive posture, the risk of gun violence increases whenever the same person who regularly distributes drugs also possesses deadly weapons.

Third, the Defendant's possession of firearms and ammunition represented an even greater danger to the public than would have otherwise existed from the already-dangerous nexus between drug trafficking and deadly weapons. Specifically, the Defendant possessed the firearms and ammunition at a time when he was not only distributing cocaine, testosterone, and marijuana, but also while he was abusing these controlled substances himself. This made the Defendant's conduct particularly dangerous, for two separate reasons.

As the jury would have been instructed, the possession of firearms and ammunition by drug addicts and illegal drug users was criminalized because Congress found that the "ease" with which such persons could acquire deadly weapons was "a significant factor in the prevalence of violent crime in the United States." Leonard B. Sand et al., *Modern Federal Jury Instructions: Criminal Pattern Instructions*, 35-46 (2022). In addition, as a drug addict or illegal drug user, the Defendant was someone who, by definition, had a limited (or nonexistent) ability to control his use of controlled substances. And, if firearms and ammunition can be deadly when they are handled by a person who is sober and in control of his or her faculties, they are necessarily far more dangerous in the hands of someone who is regularly abusing the types of drugs the Defendant was using.

Cocaine use is associated with "feelings of restlessness, irritability, anxiety, panic, and paranoia," as well as "tremors, vertigo, and muscle twitches." Nat'l Inst. on Drug Abuse, *Cocaine Research Report* at 8 (May 2016), https://nida.nih.gov/download/1141/cocaine-research-report.pdf?v=3f3fb3f0903dfa8879388c2a5d086cb9. Using large amounts of cocaine, moreover, "can lead to bizarre, erratic, and violent behavior." *Id.* Likewise, the use of synthetic anabolic steroids like testosterone can cause "dramatic mood swings, increased feelings of hostility, impaired judgment, and increased levels of aggression (often referred to as 'roid rage')." Drug Enforcement Admin., *Drug Fact Sheet: Steroids* at 2 (2020), https://www.dea.gov/sites/default/

5

files/2020-06/Steroids-2020.pdf. And marijuana use "directly affects brain function—specifically the parts of the brain responsible for memory, learning, attention, decision-making, coordination, [and] emotions." Ctrs. for Disease Control and Prevention, *Marijuana and Public Health: Brain Health* (Oct. 19, 2020), https://www.cdc.gov/marijuana/health-effects/brain-health.html. Whereas a user of any one of these substances, then, poses a risk to public safety when simultaneously possessing firearms and ammunition, this Defendant was abusing all three, and at the same time.

Fourth, the investigation revealed that the Defendant was especially reckless with his possession of weapons and use of controlled substances. Even though the Defendant had two large gun safes, the search warrant execution revealed that he kept his guns (which were not rendered safe) in unlocked bags or in cases that were lying on the floor of his basement, as pictured below.



The search also revealed that the Defendant kept hundreds of rounds of ammunition in an open box, pictured below, that was lying on the floor of the same basement.



In addition to the ammunition that the Defendant left unsecured on the basement floor, the search revealed that the Defendant kept 100 rounds of ammunition in a box, pictured below, that was located inside the trunk of his vehicle, which was parked outside his residence.



Items extracted from the Defendant's iPhone and iCloud account, depicted below, further revealed that, at various times, the Defendant even kept unsecured firearms inside his vehicle.





Not only did the Defendant keep ammunition and unsecured firearms inside his vehicle, but messages extracted from his iPhone and iCloud account, shown below, revealed that the Defendant also abused drugs inside his vehicle.

| COSTIANES | MC | Wed, 13 Mar 2019 14:38:05(PT) | For the record... **that fucking cocaine was so strong after my 5th or 6th line I was basically stuck in the truck for hours!!!Lmao** |
| COSTIANES | MC | Thu, 14 Mar 2019 18:29:21(PT) | I forgot where to go lol |
| COSTIANES | MC | Fri, 15 Mar 2019 03:33:35(PT) | What the fuck happened |
| MC | COSTIANES | Fri, 15 Mar 2019 08:04:14(PT) | What? |
| COSTIANES | MC | Fri, 15 Mar 2019 08:07:20(PT) | **All I can say is cocaine is a powerful drug Mc!!** |



Thus, none of the Defendant's reckless conduct—distributing drugs, abusing drugs, and illegally possessing firearms and ammunition—was limited to a single date and time, nor was it restricted to the privacy of the Defendant's home. The Defendant's conduct was dangerous to the public at large.

> B. **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment likewise support the imposition of a 33-month prison term. *See* 18 U.S.C. § 3553(a)(2)(A).

The Defendant's offenses were serious. The Defendant trafficked multiple substances that were controlled on Schedules I, II, and III. And, while not all drug dealers are armed, this Defendant was—though the government never discovered evidence that the Defendant was armed *while* he distributed drugs. Even among armed drug traffickers, however, the Defendant's conduct stands out. While many armed drug dealers are not drug users themselves, this Defendant was. A 33-month sentence, then, properly reflects the Defendant's uniquely dangerous conduct.

It also properly reflects the Defendant's cavalier attitude toward the law, which the Defendant demonstrated through more than just his drug distribution, his drug abuse, and his illegal possession of firearms and ammunition. For example, the Defendant—who had no medical training or experience—told a nurse at Franklin Square Medical Center that he did not "believe" in prescriptions, even though the Defendant legally could have been prescribed testosterone. *See* ECF 83 at 14. Having decided to obtain it illegally, and without medical supervision, the Defendant acknowledged to his testosterone supplier that they would have to identify a domestic

source of supply to avoid international shipments of testosterone being seized by U.S. Customs and Border Protection. *See id.* at 16.

Similarly, after one of the Defendant's cocaine suppliers was arrested, charged, and prosecuted for possessing drugs with intent to distribute them, the supplier notified the Defendant that the supplier had received a suspended sentence and would only have to serve home detention. In response, the Defendant congratulated the supplier and asked if he could buy more cocaine, as depicted below.



Finally, during the conversation below, the Defendant reminded one of his marijuana suppliers that he was continuously deleting all of their communications to avoid creating a record of their "illegal activity."

| COSTIANES [Supplier] | Thu, 08 Oct 2020 13:18:44(PT) | Tomorrow night around 7 work for you? |

| | | | |
|---|---|---|---|
| [Supplier] | COSTIANES | Thu, 08 Oct 2020 13:34:52(PT) | I can't answer you honestly right now. I might sell out, but working to get more now... Check with me tomorrow around lunch time. |
| COSTIANES | [Supplier] | Thu, 08 Oct 2020 13:39:12(PT) | If you take cash app I can pay now and pick up tonight... up to you |
| [Supplier] | COSTIANES | Thu, 08 Oct 2020 13:41:14(PT) | Instead of me giving you the cash app answer, scroll up and find it, **I've told you at least 10 times they shut my cash app off for illegal activity.** |
| COSTIANES | [Supplier] | Thu, 08 Oct 2020 13:42:07(PT) | **Oh sorry bro I forgot**... TBI. **And I delete all our messages just in case ;)** I'll hit you up tomorrow |

Because the Defendant, then, clearly understood that what he was doing was wrong, the need to promote respect for law weighs in favor of a guidelines sentence.

A 33-month term of imprisonment is also just. To be sure, the Defendant is not the type of high-volume drug supplier that is more commonly prosecuted in this District. But a 33-month sentence is not a wholesale-drug-dealer sentence. *Cf.* 18 U.S.C. § 3553(a)(6) (directing courts to consider need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct). Rather, it is consistent with the Defendant's guidelines range, which properly reflects the Defendant's status as a retail distributor with no criminal history. *See id.* § 3553(a)(4) (directing courts to consider guidelines range).

### C. The Need to Provide Adequate Deterrence to Criminal Conduct

A 33-month term of imprisonment is also consistent with the need for the sentence imposed to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B).

General deterrence is particularly important in this case because violations of § 922(g)(3) are not frequently prosecuted. To some extent, the infrequent use of this statute results from the fact that such offenses are not readily proved or even detected. Even here, the government only uncovered the Defendant's conduct during the investigation of another offense. That § 922(g)(3) offenses are not easily uncovered, however, makes the need for general deterrence even more important than in other cases. If the government cannot show that § 922(g)(3) offenses are easily

revealed, it is all the more important—for reducing crime—to demonstrate that, when these crimes are discovered, the potential punishment is significant.

### D. The Need to Protect the Public

Finally, a 33-month prison term is consistent with the need for the sentence imposed to protect the public from further crimes of the Defendant. *See* 18 U.S.C. § 3553(a)(2)(C).

The Defendant represents a public danger for multiple reasons, as outlined above. The Defendant sold drugs, the Defendant used drugs, and the Defendant possessed firearms and ammunition at the same time. While the government expects that the Defendant's status a felon will restrict limit the Defendant's ability to obtain firearms and ammunition in the future, the Defendant's history with controlled substances offers scant evidence to believe that the Defendant will abide by legal limits going forward.

Similarly, there is little reason to expect that the Defendant's conviction alone will mitigate the threat of further drug trafficking. While the Defendant has apparently become a caregiver for his sister, *see* PSR ¶ 56, the Defendant was living with his sister in her residence at the time he committed the instant offense. Because the Defendant's drug trafficking operation was relatively unsophisticated and conducted almost exclusively through the use of his cellphone, it would not be difficult for the Defendant to resume drug trafficking if the Defendant were so inclined—at least when the Defendant's drug distribution network remains intact and all of the Defendant's suppliers and customers remain contacts in the Defendant's iCloud account.

The public also deserves to be protected from the threat of further drug trafficking by the Defendant. Though not as potent as fentanyl or heroin, cocaine is a narcotic. And the distribution of dangerous narcotics like cocaine have had an increasingly devasting effect on public health in

the State of Maryland—including in Baltimore, where the Defendant's drug trafficking activities were based. According to the Maryland Department of Health:

- In 2020, when the Defendant was operating, the number of opioid-related deaths increased by 20% over 2019.

- Cocaine-related deaths increased by 6% between 2019 and 2020—an increase that was largely the result of deaths occurring in combination with opioids. 91% of cocaine-related deaths in 2020 occurred in combination with fentanyl, and 23% occurred in combination with heroin.

- In 2020, 921 people died in Maryland as a result of cocaine intoxication, with 843 of those deaths resulting from combination with heroin or fentanyl intoxication. In the Baltimore metropolitan area alone, there were 666 cocaine-related intoxication deaths in 2020.

*See generally* Md. Dep't of Health, *Unintentional Drug- and Alcohol-Related Intoxication Deaths in Maryland, 2020* (June 2021), *available at* https://health.maryland.gov/vsa/Documents/Overdose/Annual_2020_Drug_Intox_Report.pdf.

### III. Supervised Release

As to supervision following a term of imprisonment, the government agrees with the PSR's conclusion that a two-year period of supervised release—representing the middle of the Guidelines range—is consistent with the factors identified in 18 U.S.C. § 3583(c). *See* PSR at 21.

### IV. Conclusion

Thus, for the reasons set forth above, the government requests that the Court sentence the Defendant to 33 months' imprisonment, to be followed by a two-year period of supervised release.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Jeffrey J. Izant
P. Michael Cunningham
Assistant United States Attorneys